**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEVIN MINEHAN, individually and** | : | **CIVIL ACTION** |
| **derivatively on behalf of CHRISTI** | : | |
| **INSURANCE GROUP, INC.** | : | |
| *Plaintiffs,* | : | |
| | : | |
| **v.** | : | **No.   21-05314** |
| | : | |
| **ERIC G. MCDOWELL, et al.,** | : | |
| *Defendants,* | : | |
| | : | |
| **and** | : | |
| | : | |
| **CHRISTI INSURANCE GROUP, INC.** | : | |
| *Nominal Defendant.* | : | |

**<u>MEMORANDUM</u>**

**August 22, 2023**

## I.   <u>INTRODUCTION</u>

This case is about one man's extensive fraud in which he misappropriated millions of company dollars and the blowback that followed when his business partners discovered his misdeeds. Presently before the Court is an action brought by Plaintiff Kevin Minehan ("Minehan" or "Plaintiff") against his partners, Eric McDowell ("McDowell") and Andrew Lunney ("Lunney") (collectively, "Defendants"), for actions they took since his fraudulent activity came to light and counterclaims asserted by Defendants against Minehan.

Minehan asserts the following claims on his own behalf or on behalf of Christi Insurance Group, Inc. ("Christi"): (i) breach of fiduciary duty (Christi v. Defendants); (ii) breach of fiduciary duty (Minehan v. Defendants); (iii) minority shareholder oppression (Minehan v. Defendants); (iv) civil conspiracy (Minehan v. Defendants); (v) violation of Pennsylvania's Wage Payment and

1

Collection Law (Minehan v. Defendants); and (vi) appointment of a receiver (Christi v. Defendants).

Defendants, in turn, bring counterclaims against Minehan for his underlying misdeeds; specifically, Defendants assert the following claims on their own behalf or on behalf of Christi: (i) breach of fiduciary duty (Christi v. Minehan); (ii) breach of fiduciary duty (Defendants v. Minehan); (iii) conversion (Christi v. Minehan); (iv) conversion (Defendants v. Minehan); (v) unjust enrichment (Christi v. Minehan); (vi) unjust enrichment (Defendants v. Minehan); (vii) fraud (Christi v. Minehan); and (viii) fraud (Defendants v. Minehan).

The Court held a three-day bench trial in May 2023. ECF Nos. 165–167. The parties submitted dueling proposed findings of fact and conclusions of law and responses in opposition. ECF Nos. 174–176. The Court heard final oral arguments on August 2, 2023. The Court now issues the following findings of fact and conclusions of law. An appropriate order and judgment will follow.

## II.  FINDINGS OF FACT[1]

### A.  History of Christi Insurance Group

1.  Christi Insurance Group, Inc. ("Christi") is a closely held corporation based in Pennsylvania that sells commercial, marine, and personal insurance policies. ECF No. 50 ¶¶ 1-2.

---

[1] The Court makes the following findings by clear and convincing evidence. The Court recognizes that only the findings regarding fraud are required to meet this higher standard, and that all other claims require only a preponderance of evidence. Notably, with the limited exception of the Findings of Fact regarding Minehan's withheld wages and the tax and 401(k) implications (¶¶ 15, 102–109), the operative facts Minehan asserted were not established by a preponderance of the evidence.

2.  Christi was founded in 1982 by Anthony Faraco, who owned all of Christi's shares and served as President until approximately 2006. ECF No. 50 ¶ 5.

3.  Minehan joined Christi in 1991, followed by Lunney in 1993, and McDowell in 1995. ECF No. 50 ¶ 4.

4.  Presently, Minehan owns 43 percent of Christi, McDowell owns 42 percent, and Lunney owns 15 percent. ECF No. 50 ¶¶ 1-2.

5.  By the time each party joined Christi, the company had a line of credit with Firstrust Bank, N.A. ("Firstrust"). ECF No. 50 ¶ 7.

6.  Over the years, Christi transferred its line of credit from Firstrust to Penn Community Bank, and then to Huntingdon Valley Bank (the "Bank"). ECF No. 50 ¶ 10.

7.  Christi's credit line with the Bank was collateralized by a building located at 320 Bickley Road, Glenside, Montgomery County, Pennsylvania 19038 (the "Bickley Building") which was personally owned by Minehan during the relevant time period. ECF No. 169 at 45:23-25.

8.  Christi also has a Premium Trust Account, which is a regulatorily required escrow account for its insureds' premiums. ECF No. 169 at 276:1-14.

9.  The account was to be used exclusively for holding client insurance premiums in escrow and never as a funding vehicle for business expenses. ECF No. 170 at 74:1-9.

10. Instead of receiving commissions upon selling insurance policies, producers are allocated commissions only after Christi receives payment from insurance carriers. ECF No. 169 at 102:6-21.

11. To ensure producers receive timely payment and can "keep making a living," Christi uses a draw system, whereby producers receive two draws per month, which count as taxable W-2 wages. ECF No. 169 at 305:14-306:3.

12. The draws are reflected as debits in each producers' "224" account. ECF No. 169 at 305:14-306:3.

13. When Christi determines a producer's commissions, which can only be done after Christi receives payment from the insurance carrier, the commission is recorded as a credit in the producer's 224 account. ECF No. 169 at 305:14-306:3.

14. Commissions that are applied as a credit to the 224 account against the producer's draw are not taxed separately because the initial draw was taxed as W-2 wages. ECF No. 169 at 305:14-306:3.

15. Historically, Christi never withheld a producer's bi-monthly draw even if their 224 account was negative. ECF No. 169 at 95:24-2.

### B.  Plaintiff's Ascension to President

16. Between 2004 and 2005, Faraco appointed Minehan as President of Christi, a decision unchallenged by either McDowell or Lunney. ECF No. 169 at 19:2-4, 13-18.

17. After becoming President, Minehan discovered that Faraco had mishandled Christi's finances by, among other things, misappropriating client and insurance-company funds for his personal use. ECF No. 169 at 19:22-20:12, 22:2-12.

18. When Minehan confronted Faraco about his financial misconduct, Faraco resigned and sold his remaining shares to Minehan, McDowell, and Lunney. ECF No. 169 at 18:9-20.

19. Minehan, in exchange for signing a non-competition agreement, received personal ownership of the Bickley Building. ECF No. 169 at 45:18-46:9.

20. This arrangement left Minehan as the sole guarantor of the associated credit line which, at the time of Faraco's resignation, was essential to Christi because of the significant debt Faraco incurred. ECF No. 169 at 46:9-10.

21. Following Faraco's resignation, Christi hired a forensic auditor, who investigated the company's finances and concluded that Faraco misappropriated substantial sums of money from Christi. ECF No. 170 at 175:12-15; ECF No. 169 at 27:5-6.

22. However, because Christi was an "agency-bill" company[2] at the time (as opposed to a "direct-bill" company), the forensic auditor could not determine the full extent of Faraco's misconduct. ECF No. 169 at 27:6-23; D-2.

23. At the instruction of a district attorney, Minehan, McDowell, and Lunney used Christi's credit line to issue refunds of approximately $175,000 to customers harmed by Faraco's malfeasance. ECF No. 169 at 24:21-25:3.

24. After the issued refunds and outstanding bills, the balance on Christi's credit line when Minehan, McDowell, and Lunney became shareholders in 2006 was over $700,000. ECF No. 169 at 25:6-18.

**C.  Plaintiff's Financial Misconduct During Tenure as President**

25. Minehan served as President of Christi from 2005 to November 2021, during which time he controlled the company's finances.

---

[2]      An "agency-bill" company channels most insureds' premiums through an agency on the way to the insurer, which meant that closing or freezing accounts long enough to ascertain account balances was not feasible.

26. During his tenure as President, Minehan worked closely with bookkeeper Connie Rongione to manage and record his finances. *See, e.g.*, ECF No. 169 at 76:22-77:9.

27. Minehan communicated via email with McDowell and Lunney regarding financial transactions and Christi's overall financial health, involving them in the decision-making processes to some extent. *See, e.g.*, ECF No. 169 at 239:7-13; Ex. P-190; Ex. P-404.

28. However, though Minehan purported to be transparent with his partners regarding Christi's financial transactions, the documents and updates provided obscured the true state of Christi's finances because many transactions were not recorded on the company's general ledger or were miscoded.

29. Specifically, Rongione used a set of handwritten, paper books to record Minehan's personal transactions.[3] ECF No. 169 at 29:6-13; ECF No. 169 at 217:4-7.

30. These expenses were not recorded in Christi's general ledger or its financial statements. *See, e.g.*, Ex. D-15; ECF No. 169 at 217:4-7.

31. Minehan knew these handwritten books existed; other shareholders were completely unaware. Ex. D-5; ECF No. 169 at 197:23-198:2.

32. While President, Minehan maintained a lavish lifestyle, making various luxury purchases, flying on private jets, and building a custom personal residence.

---

[3] The evidence at trial indisputably showed that Rongione kept a separate, handwritten set of records to track Minehan's business transactions (both business-related and personal). The evidence further showed that Minehan was the only person who knew about Rongione's practice of tracking transactions in this manner. The Court refers to such notes as a second set of books (Plaintiff would have the Court refer to them as something less nefarious such as supplemental handwritten records) but, regardless of what they are referred to as, they served the same purpose: obscuring, concealing, and hiding Minehan's transactions.

33. Minehan directed Rongione to initiate personal transactions using Christi's credit line, including approximately $200,000 for a gold coin, $538,000 for a yacht, and $450,000 for a cattle farm. ECF No. 50 ¶¶ 33–36.

34. Though Minehan generally informed the other shareholders of some of these transactions, his communications were misleading in that they did not inform shareholders that Christi would be paying for these items. ECF No. 169 at 260:6-9; ECF No. 169 at 263:17-25; ECF No. 170 at 187:3-12.

35. Without Defendants' knowledge or approval, Christi further paid $219,031 for Minehan's "excess" life insurance payments and $24,895 for his third vehicle. Ex. D-42 ¶ 22; ECF No. 169 at 260:21-261:20

36. Payments for this third vehicle were coded under "miscellaneous auto"[4] instead of his regular automobile account to obscure company sponsorship of an additional vehicle, as it was "generally understood" at Christi that Minehan and McDowell would be entitled to reimbursements for the cost of just two vehicles. ECF No. 169 at 260:21-261:20; ECF No. 170 at 103:10-25; Ex. D-42 ¶ 22.

37. Though Christi did not have a formal policy on permitted car payments at the time, Minehan ensured that the other shareholders were not aware of the payments. ECF No. 169 at 56:24-57:1; ECF No. 170 at 103:10-25.

38. Between January 1, 2012 and December 31, 2021, Minehan incurred approximately $2,027,126 in credit card reimbursements (approximately 79% of total company reimbursements), compared to approximately $551,705 for McDowell and Lunney together during that same period. Ex. D-42 ¶¶ 24-25.

---

[4]    The code, "miscellaneous auto," generally referred to auto-related expenses such as gas and tolls. ECF No. 169 at 261:14-16.

39. In contrast, Minehan generated only approximately 35.1% of total commissions generated by him, McDowell, and Lunney. Ex. D-42 ¶ 26.

40. Minehan claims that his portion of reimbursements is higher because he more frequently charged business expenses to his accounts during company outings and, indeed, Minehan permitted Christi employees to charge business expenses to his personal credit card. ECF No. 170 at 181:1-8.

41. However, this explanation does not match the volume of such expenses nor does it explain Minehan's efforts to mislead his business partners regarding Christi's finances. Minehan's mischaracterization of personal expenses as business expenses was not of the garden variety scenario where a business owner bills an arguably social dinner to their business account. The record fully demonstrates that he extensively billed clear personal expenses, often of a significant nature, to his business account.

42. Though Minehan testified that he never intentionally miscoded expenses, he repeatedly instructed Rongione to both miscode expenses and not record them in the company general ledger, presumably in an effort to obscure the nature and extent of his expenditures over the course of several years. ECF No. 169 at 140:13-24; s*ee, e.g.*, Ex. D-15 (reflecting handwritten supplement); ECF No. 169 at 217:4-218:2.

43. For example, Minehan used Christi funds to pay for landscaping necessary to set up WiFi connectivity at Minehan's personal property in Florida, and Rongione coded the expenses as "insurance." ECF No. 169 at 168:3-18; Ex. D-83.

44. Though Minehan likened this expense to Christi paying for McDowell's work phone while entertaining clients on boats, the miscoding of Minehan's payments undermines this justification. *See* ECF No. 169 at 168:8-11.

45. On another matter, Minehan instructed Rongione to code payments for construction work done on his personal property (1317 Dogwood Lane) under various categories on different occasions, including "insurance," "sales," "rent," "maintenance repairs," and "referral fee." *See, e.g.*, ECF No. 169 at 146:15-147:9.

46. On another occasion, Minehan directed Rongione to code a payment to Grant Peak (Minehan's friend and client) for work performed at his property as half to "sales" and half to "insurance." ECF No. 169 at 151:25-152:4; ECF No. 169 at 154:23-155:1.

47. Minehan asserted that subtenant, Christi Benefits, owed him rent, and that his excessive expenditures or miscoded expenses over the years were "offsets" for that owed rent. ECF No. 169 at 142:2-9.

48. However, the lease with Christi Benefits designated Christi Insurance Group, not Minehan, as the landlord entitled to rent payments. Ex. D-88.

49. At trial, Minehan testified that his signature on the lease agreement was forged or that someone else had used a stamp of his signature to sign the lease, notwithstanding that Minehan, as both Christi's President and the property landlord, would have been integral in lease negotiations and review of the lease following its execution—and therefore likely would have noticed that someone had signed on his behalf prior to mid-trial in this case. ECF No. 169 at 187:8-21; ECF No. 169 at 235:19-25.

50. Minehan instructed Rongione to code thousands of dollars in landscape architecture for his personal property as "building maintenance" recorded as an expense under his 224 account.

51. Minehan ensured that McDowell and Lunney received documentation indicating that the landscaping was coded under his "personal" account but, subsequently, after

issuance of Christi's year-end financial statements were distributed, the expense was changed back to building maintenance. Ex. D-71; ECF No. 169 at 174:24-179:16.

52. Minehan's justification throughout trial for utilizing Christi's finances to pay for improvements to his personal properties was that these properties were collateral and that improvements strengthened Christi's financial position. *See, e.g.*, ECF No. 169 at 164:4-168-2.

53. This justification does not hold up; though Minehan provided self-serving testimony on this issue, there was no documentary evidence that showed he had an obligation with the Bank to maintain his personal property only because it was collateralized; this was merely a ruse and an excuse to justify to the Court pouring money into his personal properties.

54. There were some limited instances where Minehan used Christi funds to pay for expenses that were arguably business-related, but also personally benefitted Minehan.

55. For example, Minehan billed a landscaper to dig a trench to run a WiFi line at his home because he needed internet to work from his personal residence—Christi was fully billed for this work, though WiFi connection at his home would have an extensive personal use as well. ECF No. 169 at 168:3-18.

56. When asked why certain expenses might have been recorded under various categories (*i.e.*, coding payments made to yacht personnel as "professional fees" or "employee benefits"), Minehan blamed Rongione and claimed that he did not direct such coding, feigned ignorance, or claimed that such coding was a mistake. ECF No. 169 at 179:13-16; ECF No. 169 at 170:1-25.

57. Minehan stated that any miscoded expenses were mistakes made by Rongione, despite his being directly responsible for ensuring she keep accurate records. ECF No. 169 at 173:7-13.

58. For six years, Minehan and Rongione frequently exchanged emails containing unprofessional content. *See, e.g.*, ECF No. 169 at 199:14-19; ECF No. 169 at 225:16-226:1; Ex. D-25.

59. Minehan and Rongione did not have a romantic relationship, but it is undeniable that their business communications were often unprofessional and, as a result, Minehan was able to exert pressure on Rongione so that expenses were coded as he saw fit and other financial misconduct was obscured. ECF No. 169 at 225:20-226:1.

60. At the very least, the nature of the working relationship between Minehan and Rongione, which crossed the line from business-related to personal and then to uncomfortably unprofessional, walled them and Christi's financial information off from other Christi partners to a significant degree.

61. Indeed, Minehan instructed Rongione to disregard inquiries from other shareholders about Christi finances because they "really didn't understand the accounting end of it" and "relied on [Minehan] immensely to understand that job." ECF No. 169 at 199:20-200:1.

62. In addition to miscoding expenses, Minehan siphoned money away from Christi accounts into his personal accounts at least 100 times. Ex. D-42 ¶ 38-39.

63. For instance, Minehan repeatedly skimmed a total of $99,000 of commissions directly from an entity called "State Auto" without Defendants' knowledge. Ex. D-42 ¶¶ 64-68; Ex. D-59.

64. Minehan also paid himself a thirteenth month of rent for several years (totaling $59,000) for Christi's use of the Bickley Building, again without the Defendants' knowledge or approval. Ex. D-42 ¶ 63.

65. Minehan further admitted to taking unrecorded loans from the company during the 2008-2009 financial crisis and keeping the funds in his personal bank account. ECF No. 169 at 240:17-20.

66. Minehan also borrowed funds from Christi employees' 401(k) accounts, occasionally neglecting to fund them altogether. Ex. D-10; ECF No. 169 at 200:14-20.

67. Rongione's warning about the negative consequences should employees realize changes to their 401(k) accounts, and Minehan's callous response to this warning ("Fuc them" [sic]), demonstrates that Minehan disregarded the potential consequences for Christi's employees. Ex. D-10; ECF No. 169 at 200:14-20.

68. As a "cushion" or "hedge" against potential financial difficulties, Minehan admitted to regularly overdrawing his 224 account by approximately $250,000, meaning that he owed Christi funds. Ex. D-24; ECF No. 169 at 207:7-19.

69. Indeed, Minehan's 224 account balance was consistently negative from at least January 2012 through December 31, 2021. Ex. D-42 ¶ 53.

70. Overdrawing his 224 account amounted to Minehan paying himself commissions he did not earn.

71. Christi's Premium Trust Account, which was meant to exclusively hold client funds in escrow, often had a negative balance as well. ECF No. 169 at 276:15-18.

72. During one period (from January 1, 2012 through approximately June 30, 2017), Minehan utilized the Premium Trust Account to pay personal expenses equaling approximately 63% of all commissions charged to his 224 account.[5] Ex. D-42 ¶ 44.

73. Unbeknownst to Defendants, various transactions recorded on the general ledger indicated inflows (via check or wire transfer) seemingly replenishing the Premium Trust Account by charging Minehan's 224 account. Ex. D-42 ¶¶ 48-49.

74. As Defendants' forensic expert later concluded, these transactions were not necessary in Christi's normal course of business and reflect direct use of Christi funds for Minehan's personal use. Ex. D-42 ¶ 48-49.

75. Additionally, purportedly at the direction of the CIA, Minehan funneled approximately $1 million through Christi to a bank in the Bahamas and Christi incurred related bank fees.[6] ECF No. 169 at 215:15-18.

76. When McDowell and Lunney questioned Minehan about his management of Christi's finances, Minehan responded defensively, instructed Defendants to stay out of his way, and provided incomplete or inaccurate financial records. *See* Ex. D-2 ("You have no idea what all goes into closing the books or how large a posting month December normally is for me and Christi"; "This is my job and you need to back off and let me do it and just sell"; "I have earned the right to be left alone").

---

[5]     This amount excludes an additional $199,391 in outflows from the Premium Trust Account to Minehan that were unrecorded in the general ledger during that same time period. ECF No. 132-3 ¶ 44, n. 28.

[6]     No direct evidence of the CIA's involvement was elicited at trial. Indeed, Plaintiff's counsel did not seek to question any witnesses under seal, produce sealed exhibits, or produce evidence for *in camera* review. The only testimony in support of this CIA-sanctioned transaction was vague testimony that, if such a scheme existed, Minehan would have signed an NDA. Even so, Defendants do not contest this scheme and do not seek damages associated with it other than bank fees. Therefore, the Court makes no findings regarding the legitimacy of the CIA's involvement in funneling money to offshore accounts.

77. Because of Minehan's miscoding and obfuscation, the limited financial statements that Defendants received were neither complete nor accurate and, therefore, Defendants were unaware that Minehan was misusing Christi funds. ECF No. 169 at 258:6-16.

**D. Jardel Whistleblow**

78. Having been walled from Christi's operations and financial management during Minehan's tenure as President, McDowell and Lunney became aware of Minehan's fraud *in medias res*, after over a decade of concealed misconduct.

79. Christine Jardel assumed a part-time position as Christi's controller in July 2020. ECF No. 170 at 64:4-5.

80. Jardel, who had 35 years' experience in accounting matters for insurance agencies, first became suspicious about Minehan's financial practices after beginning a full-time role in October 2020, when she noticed that personal payments to Minehan were coded to various general ledger accounts in which they did not belong. ECF No. 170 at 70:24-71:10.

81. Jardel was similarly concerned that she was asked to send payments without invoices and she witnessed Minehan charging different categories at Christi for payments made to individuals who "had nothing to do with Christi." ECF No. 170 at 71:11-19.

82. Finally, Jardel was alarmed upon noticing that the Premium Trust Account was always negative, while commissions and profit-sharing were still being paid out. ECF No. 170 at 74:10-75:4.

83. Jardel recalled instances where Minehan used the Premium Trust Account for personal expenses. ECF No. 170 at 92:22-25.

84. Minehan admitted to requiring Jardel to send him financial statements so that he could "check them" before sending them to McDowell or Lunney. ECF No. 169 at 211:12-19.

85. Indeed, Minehan and Rongione instructed Jardel to provide financial information only to Minehan, and not to McDowell or Lunney directly. ECF No. 170 at 68:6-69:7.

86. Jardel was not permitted to give McDowell and Lunney the status of account reports, which would have shown Minehan's miscoded expenses. ECF No. 170 at 69:8-23.

87. Jardel testified that Minehan explicitly instructed her to hide expenses and not to share financial information with Defendants. ECF No. 170 at 103:23-25; ECF No. 170 at 70:4-18; ECF No. 170 at 70:21-23.

88. In spring of 2021, Jardel alerted Defendants to Minehan's potentially fraudulent behavior. ECF No. 170 at 39:4-9.

89. On June 1, 2021, counsel for Defendants sent a letter to Minehan requesting that certain financial controls be implemented to increase financial transparency at Christi. Ex. D-26; ECF No. 169 at 274:5-13.

90. Minehan rejected this request and (unsuccessfully) instructed Jardel to shred accounting documents on June 2. Ex. D-27; ECF No. 170 at 77:2-14.

91. Later that month, Defendants retained L. Eric Ringoen to perform a forensic analysis. ECF No. 169 at 10:10-12.

92. In November 2021, Ringoen issued preliminary schedules highlighting Minehan's fraudulent behavior, concluding that "the lack of management oversight, accountability and transparency contributed to [Christi's] escrow bank accounts' negative balance and the need for voluminous line of credit activity." Ex. D-29.

93. Subsequently, upon realization that the Bank was going to freeze Christi's line of credit, Minehan acted quickly to negatively affect Christi's overall financial position by instructing Jardel to pay down the line of credit with $100,000 from the payroll account and prepay personal expenses that were not yet due (which left only $10,000 in the Agency's escrow, though $380,000 in premiums were imminently due). ECF No. 169 at 267:22-269:10; ECF No. 170 at 83:18-85:4; ECF No. 170 at 104:8-105:4; ECF No. 170 at 147:1-148:2.

94. Minehan then proactively created the imminent financial crisis, forced a capital call,[7] demanding money from all shareholders to pay the $380,000 of premiums,[8] notwithstanding that his 224 account reflected a negative $250,000 balance. ECF No. 169 at 267:22-269:10; ECF No. 170 at 83:18-85:4; ECF No. 170 at 104:8-105:4; ECF No. 170 at 147:1-148:2.

95. However, Lunney and McDowell were able to meet the capital call and, subsequently, in the wake of Minehan's actions, Lunney and McDowell voted to remove Minehan from his role as President at a special shareholders' meeting on November 23, 2021, and assumed management control over Christi. ECF No. 50 ¶¶ 24—26.

**E.  Subsequent Events**

96. Shortly after removing Minehan as President, Christi implemented eleven governance policies to increase oversight and transparency among its partners. Ex. J-01.

97. Minehan received notice of these policies several months before they took effect.

---

[7]     Defendants claim that this was a tactic designed to pressure Lunney and McDowell into selling their shares of Christi for an artificially low value rather than fronting the money required to pay Christi's premiums. However, at trial, this was only mentioned by Defendants' counsel during opening statements and closing arguments, and no evidence or testimony was elicited to support such a finding.

[8]     This money was repaid to shareholders in April of 2023. ECF No. 169 at 267:22-269:15.

98. Due to his previous misconduct, other shareholders were weary of Minehan and sought to keep a close eye on his financial dealings. ECF No. 170 at 173:7-174:18.

99. These policies were facially neutral; however, several provisions were enacted as a reaction to Minehan's misconduct and, therefore, targeted Minehan to the extent that his behavior was not aligned with that of other shareholders. ECF No. 169 at 275:2-25.

100. Defendants, who collectively maintained a majority vote, did not discuss certain management decisions with Minehan when his opposing position was already known and the corrective actions were taken to thwart or rectify Minehan's mismanagement and fraud (*i.e.*, the decision to move to a new office space that was not owned by Minehan). ECF No. 169 at 326:20-21.

101. While the new governance policies and exclusion of Minehan from management decisions appear to disproportionately target Minehan, much of Defendants' managerial decisions were reasonable given Minehan's misconduct.

102. As an offset to his negative 224 account balance, Christi withheld Minehan's bi-weekly draws and issued him a Form 1099 for year-ended 2022 in lieu of a W-2. ECF No. 169 at 269:23-271:23.

103. Despite earning $226,385.67 in commissions between November 2021 to December 2022, Minehan did not earn any W-2 wages because his wages were withheld to pay down his 224 account. ECF No. 131-4 ¶ 16.

104. In contrast, Minehan was issued a W-2 for year-ended 2021 even though his commissions were withheld that year as well. Ex. P-467 at 5.

105.   Paying down Minehan's debt by withholding his draws was consistent with a governance policy implemented in December 2021 which provided that no shareholder could have more than a $25,000 debit in their escrow account. ECF No. 169 at 270:4-7.

106.   Due to receiving a Form 1099 rather than W-2 wages, Minehan was prevented from contributing the maximum amount permitted to his 401(k) account in 2022 ($20,500). ECF No. 169 at 307:14-22.

107.   Had Minehan contributed the maximum to his 401(k), Christi would have contributed an additional $10,250. *See* ECF No. 131-4 ¶ 10.

108.   Because the balance in Minehan's 224 account reflected draws Minehan took in previous years, which were taxed at that prior time, Minehan's commissions, which were recorded as 1099 earnings, represented a double tax on the monies. ECF No. 131-4 ¶ 17; ECF No. 169 at 104:8-105:6; ECF No. 170 at 27:23-28:12.

109.   Minehan's account reflects chargebacks in November and December of 2021 for a total of $9,382.55 which he claims should have been credits and which were not explained or otherwise addressed by Defendants. Ex. P-618.

110.   Throughout this litigation, Minehan has claimed that he is owed $477,500 in "deferred maintenance" on the Bickley Building. Ex. P-603; ECF No. 169 at 55:12-56:9.

111.   As to their respective obligations related to maintenance, the building lease provides that the lessee shall "keep the premises in good repair and in clean condition" but that "Lessor shall keep in good order and repair the roof, foundation and structural walls of the premises and Lessee shall have no repair or maintenance obligations with

respect to the foregoing except to the extent occasioned by the acts of Lessee." Ex. J-08.

112.   The inspection report Minehan provided estimating the amount of required maintenance included major structural work such as repairs to the foundation and roof. Ex. D-1 (Attachment A at 118); *see also* ECF No. 169 at 128:1-129:6 (indicating Minehan's position that everything in the inspection report would be recorded as "deferred maintenance" under the lease).

113.   Additionally, the "deferred maintenance" assessment was performed by a biased source (*i.e.*, Minehan's brother-in-law). ECF No. 169 at 132:23-35.

114.   Moreover, Lunney testified at trial that Christi spent approximately $35,000-$40,000 per year on maintenance for the Bickley Building and never refused to perform maintenance requested by Minehan. ECF No. 170 at 153:13-154:1, 154:4-8.

115.   Defendants hired Brian Duffy, CPA, to conduct a comprehensive forensic investigation and expert report; Plaintiff did not conduct a similar forensic investigation.

116.   Duffy analyzed Christi's general ledger, bank statements, and other related schedules across four accounts to understand the inflows and outflows of funds, investigate how and whether transactions were recorded, and determine whether Christi's assets were misappropriated. ECF No. 170 at 218:2-20.

117.   Duffy's initial report revealed substantial misappropriation of Christi funds by Minehan within a ten-year period. Ex. D-42.

118.   After receiving additional discovery from Minehan regarding his "repayments" of amounts borrowed from Christi, Duffy supplemented his initial report with updated schedules. *See* Ex. D-45.

119.   Duffy's supplemental report acknowledged that Christi funds had been transferred to Minehan's personal bank accounts, that Minehan had improperly directed the use of the Premium Trust Account, and ultimately identified eleven categories of misappropriation by Minehan. Ex. D-45.

120.   Ultimately, Duffy concluded that Minehan owed Christi $2,842,104 in direct damages and pre-judgment interest as of July 10, 2023.[9]

121.   However, as Duffy acknowledged in his initial report, given Minehan's constant use of the 224 account, it is impossible to know "the various machinations employed by Mr. Minehan" to obscure his misappropriation. Ex. D-42 ¶ 58.

122.   In connection with ongoing litigation, Minehan has submitted schedules that detail "repayments" to Christi and purport to account for approximately 90% of the misappropriated money. *See* ECF No. 169 at 237:23-238:2.

123.   Even after accounting for these subsequent "repayments," Duffy concluded that there is still a shortfall of approximately $489,000 for unrecorded transfers, wires, and deposits. Ex. D-45 ¶ 6.

124.   This shortfall reflects amounts that Minehan claimed to have repaid but, in fact, represented bounced checks, duplicate payments, payments that were not actual

---

[9]   Per the Court's directions, this final schedule "removes the extrapolation of otherwise identified misuse of credit card reimbursements for the period 2018 through 2021 as well as the expenses that were testified to as business expenses." ECF No. 173 at 21.

repayments to Christi, and transactions that were immediately withdrawn for transfer to other outside parties. Ex. D-42 ¶ 85.

125.    For example, when cross examined at trial about specific "repayments" for which Minehan was not credited, Duffy followed the money and was able to find that several specific "repayments" were actually bounced checks or were immediately transferred to third parties for Minehan's personal benefit. ECF No. 170 at 298:1-6 ("I believe that was an instance where the check bounced and another check was issued. That's the 1101, which is just below it. That was issued in place of the [first check]. So in this instance, that check bounced, so we didn't count it logically."); ECF No. 170 at 301:1-6 ("[I]t turns out that a bunch of those purported repayments came into the agency and immediately went out to another third party that was personal to Mr. Minehan, so it did not constitute a repayment of funds to the agency.").

126.    Duffy's forensic accounting and calculation of damages reflects eleven categories of misappropriated funds for a total of $2,118,430 in damages and $723,674 in pre-judgment interest. ECF No. 174, Ex. 1.

127.    On January 11, 2023, Christi paid Minehan 43% of the amount Christi distributed to the shareholders ($350,000). ECF No. 129-2 ¶ 26.

128.    On April 3, 2023, Christi reimbursed shareholders for the 2021 capital call. ECF No. 169 at 269:16-18.

129.    Since Minehan was removed as President, Defendants have provided Minehan with daily bank account statements, monthly financial reports, and producer reports and his family members who are employed by Christi have remained employed and have even received raises. ECF No. 169 at 264:14-18; ECF No. 169 at 266:1-12.

130.    Defendants have provided Minehan with notice of shareholder meetings and agenda items. ECF No. 169 at 264:20-22; Ex. D-39; D-40; D-41.

131.    Since Minehan was removed as President, it has become clear that Christi did not actually need the line of credit and the line has been substantially paid down. ECF No. 169 at 254:22-255:16.

132.    Additionally, profits have increased by more than $800,000 as compared to Minehan's presidency. ECF No. 169 at 252:19-25.

133.    Minehan continues to be paid 43% of the profit distributions. ECF No. 169 at 269:16-18.

## III.   **CONCLUSIONS OF LAW**

### A.  **Preliminary Matters**

The Court finds Minehan not credible, Defendants credible, and Ms. Jardel credible. Additionally, the Court finds Duffy's report and testimony admissible. Finally, the Court finds that Defendants, rather than Minehan, have asserted a proper derivative action on Christi's behalf.

### i.  **Credibility**

Faced with inconsistent testimony, the Court must assess the credibility of the witnesses. The Court has witnessed Minehan contradict himself and the evidence countless times over the course of this case and, specifically, during this trial. Based on Minehan's demeanor, his consistent contradictions, his self-serving narrative that reflected an utter lack of accountability or nuance, and his bald denial of the documentary evidence, the Court deems Minehan not credible. Accordingly, the Court will disregard much of his self-serving testimony under the principle of *falsus in uno, falsus in omnibus*. *See Bennum v. Rutgers State Univ.*, 941 F.2d 154, 179 (3d Cir. 1991) (the Court may, like any factfinder, assess credibility in light of this maxim), *abrogated on*

*other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). Conversely, the Court deems Defendants credible and notes that their testimony is largely supported by the documentary evidence. Finally, and importantly, the Court finds the testimony of the non-party fact witness, Christine Jardel, to be credible.

### ii.   Duffy Report

The Court denied Plaintiff's *Daubert* motion as to Brian Duffy, CPA, on May 1, 2023. ECF No. 143. At trial, Plaintiff's counsel spent considerable time attempting to cast doubt on Duffy's methodology. *See* ECF No. 170 (Duffy cross examination); *see* ECF No. 171 (Brennan direct examination). Now, again, Plaintiff argues that Duffy's expert testimony should be disregarded. ECF No. 174 at 100–08. Specifically, Plaintiff argues that: (1) Duffy's testimony is unreliable; and (2) Duffy's testimony is unhelpful to the factfinder. *Id.* at 100.

Rule 702 has "a liberal policy of admissibility," *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citation omitted), and accordingly, the "rejection of expert testimony is the exception and not the rule." *Dorman Prods. v. PACCAR, Inc.*, 201 F. Supp. 3d 663, 686 (E.D. Pa. 2016) (quoting Fed. R. Evid. 702 Advisory Committee Note). The Third Circuit has explained that to survive a *Daubert* challenge, an expert must satisfy three "restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted). The party offering the expert must prove each of these requirements by a preponderance of the evidence in order to be admissible. *See In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999).

Plaintiff's first argument focuses on the reliability of Duffy's testimony. The reliability requirement of *Daubert* "means that the expert's opinion must be based on the 'methods and

procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her beliefs." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). "The reliability requirement is not to be applied 'too strictly' and is satisfied as long as the expert has 'good grounds' for his or her opinion." *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 228 (E.D. Pa. 2017) (quoting *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 784 (3d Cir. 1996)). "[I]n making reliability determines, courts must err on the side of admission rather than exclusion." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 857 (3d Cir. 1990).

The Court finds Duffy's methodology reliable. Over the course of two days, Duffy described and was cross-examined on, *inter alia*, the process by which he analyzed Christi's financial transactions. ECF Nos. 170, 171. Plaintiff characterizes his methodology as *ipse dixit*, simply because Duffy tailored his methodology to the specific and unique circumstances of this case as informed by his substantial experience in forensic accounting. This is a false equivalency and, moreover, ignores Duffy's testimony that he utilized ten distinct methodologies and his report outlining these methodologies. ECF No. 170 at 195:6-18; Ex. D-42. For example, Duffy reviewed Christi's general ledger, identified thousands of credit card reimbursements, reviewed the underlying credit card and bank statements, reviewed documents produced in discovery, reviewed the handwritten books, and emails to, as Plaintiff's expert put it, "follow the money." *See* Ex. D-42 (Exhibit 2 listing all documents considered). This is a far cry from *ipse dixit* opinions; rather, there are "good grounds" for Duffy's opinions.[10]

---

[10] Though Plaintiff points to a few, limited instances where Duffy's incorrectly determined that a business expense was personal, this does not undermine the entirety of Duffy's testimony. Indeed, Duffy's summary of misappropriated funds has been updated to reflect those line items that Plaintiff showed to be business-related. Moreover, Duffy's testimony and his report show that, while Defendants and Jardel were consulted, Duffy's analysis did not begin or end with their input. Additionally, Duffy updated his summary to remove the complained of extrapolations.

Plaintiff's second argument is that Duffy's testimony does not fit the case because it is unhelpful to the factfinder. As the factfinder in this bench trial, the Court is well positioned to conclude that Duffy's testimony was indeed quite helpful. "Testimony 'fits' a case when it is 'relevant for the purposes of the case and . . . assist[s] the trier of fact.'" *In re Flonase Antitrust Litig.*, 884 F. Supp. 2d 184, 189–90 (E.D. Pa. 2012) (quoting *Schneider*, 320 F.3d at 404). Duffy's report and testimony are helpful in many respects but, most crucially, in cross-checking Minehan's self-serving statements against the financial records[11] and determining the remaining shortfall between Minehan's misappropriation and the purported repayments by removing those "repayments" that were duplicative, bounced checks, or were immediately siphoned back out of Christi for Minehan's personal use.

*Daubert* instructs that other recourse is favored rather than deeming an expert inadmissible. First, opposing counsel may vigorously cross-examine the expert. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). Plaintiff's counsel did precisely that. Second, contrary evidence may be presented. *Id.* Here, no other forensic accounting was performed that might undermine Duffy's findings and, indeed, Plaintiff's expert acquiesced that Duffy "followed the money." ECF

---

Finally, Plaintiff's expert opined as to additional steps that Duffy could have performed in conducting his analysis. Though additional procedures and investigation could further bolster Duffy's findings, the lack of such procedures does not discredit his report. The Court also notes that Minehan did not obtain an expert to conduct a forensic accounting investigation on his behalf.

[11]    Duffy's report and testimony helpfully outlined the extent of Minehan's financial misdeeds, the various ways in which Minehan misappropriated money, and calculated the appropriate pre-judgment interest. Duffy did not, as Plaintiff contends, simply take Defendants' word for which items were improper. Rather, Duffy compared Minehan's statements with the records. *See, e.g.*, Ex. D-42 at 19 n.20 ("[W]hen asked if he'd ever moved money from Christi accounts to his personal line of credit or personal accounts, Mr. Minehan responded 'I never did.' . . . My analysis of the Agency bank statements identified more than 100 transactions described as a transfer to Mr. Minehan's accounts, and 93 transactions labeled solely as 'Kevin.'").

No. 171 at 64:9-14. Though Plaintiff fervently opposes Duffy's methods, findings, and testimony, the Court deems his testimony and report both admissible and credible.[12]

### iii.   Derivative Claims

Both parties purport to bring derivative claims on behalf of Christi. However, the Court must conduct an independent inquiry to determine whether the actions are direct or derivative. To make this determination, the Court must disregard the parties' designations and, instead,

---

[12]      Plaintiff also argues that Duffy's reports and summary schedules should be stricken under Federal Rule of Evidence 1006. Rule 1006 provides that a party "may use a summary, chart, or calculation to prove the content of voluminous [materials] that cannot be conveniently examined in court" and the proponent "must make the originals or duplicates [of the summarized materials] available for examination." Fed. R. Evid. 1006. "To have a summary admitted, the proponent of a summary must lay a proper foundation and show that the summation is accurate." *United States v. Malik*, 424 F. App'x 122, 128 (3d Cir. 2011). "Decisions in . . . connection [with the admissibility of Rule 1006 evidence] are committed to the sound discretion of the trial court, which in this context is very broad." *United States v. Bansal*, 663 F.3d 634, 668 (3d Cir. 2011). Rule 1006, however, is "not a back-door vehicle for the introduction of evidence which is otherwise inadmissible" and "the voluminous evidence that is the subject of the summary must be independently admissible." *Eichorn v. AT&T Corp.*, 484 F.3d 644, 650 (3d Cir. 2007) (citation omitted).

Plaintiff first argues that Duffy's schedules "are nothing more than summaries and calculations" and should therefore be stricken. ECF No. 174 at 108. Yet, Rule 1006 specifically permits the admission of summaries.

Additionally, upon review of the documents considered by Duffy (Exhibit 2 of his report), the Court finds that the underlying documents are sufficiently voluminous to permit Defendants to summarize them (*e.g.*, Ringione schedules, Christi financial statements from 2012-2021, charts of accounts, general ledgers, balance sheets, income statements, producer reports, credit card statements, bank statements, credit line statements). There is nothing to suggest that Defendants refused to provide these original materials (to the extent they were not produced in discovery) and, it seems, Defendants even provided the underlying calculations. *See* ECF No. 170 at 263:23-24 (when asked about the calculations informing his Duffy stated "[t]he schedule underlying that analysis[,] I believe we turned that over."). Indeed, Plaintiff does not argue that they requested the original source documents at any time and that Defendants were unable or unwilling to provide them, or that they were not already produced in discovery.

Finally, Plaintiff does not attack the admissibility of the underlying materials described in Exhibit 2 of the Duffy Report. *See United States v. Georgiou*, No. 09-CV-88, 2018 WL 9618008, at *42 (E.D. Pa. June 19, 2018) ("Under Rule 1006, summary evidence is admissible only if the underlying materials upon which the summary is based are admissible[,] . . . [h]owever, Rule 1006 does not require that the underlying materials actually be admitted into evidence." (citations omitted)).

Accordingly, the Duffy charts will not be stricken under Rule 1006.

"independently examine the body of the complaint, the nature of the injury alleged and the relief sought." *Resh v. Bortner*, No. 16-CV-02437, 2016 WL 6834104, at *5 (E.D. Pa. Nov. 21, 2016). An action is derivative if "the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent dissipation of its assets." *Grill v. Aversa*, No. 12-CV-120, 2014 WL 4672461, at *7 (M.D. Pa. Sept. 18, 2014) (quoting *Morrison Informatics, Inc. v. Members 1st Credit Union*, 97 A.3d 1233, 1238 (Pa. Super. 2014). Conversely, an action is direct if "the gist" of the claim is harm suffered by an individual shareholder directly or based on some duty owed to the individual. *See id.*

The derivative claims set forth in Minehan's Amended Complaint almost entirely relate to since-abandoned allegations of an alleged merger with McFadden Scott and similarly forgone breach of contract claims. ECF No. 57 at 23–27, 35–37. These claims were not pursued at trial. All other claims asserted belong to Minehan directly and any asserted harm to Christi is, at most, tangential. Indeed, the overarching theme of Minehan's case is minority shareholder oppression: *Minehan* was not privy to decision-making discussions, *Minehan's* wages were withheld, *Minehan* was not able to contribute to his 401(k), *Minehan* was unfairly ousted, and *Minehan* is owed money for deferred maintenance. None of these claims, or the evidence elicited at trial, support Minehan's derivative action. Therefore, the Court will treat Minehan's claims as direct claims only.

Conversely, Defendants are properly representing Christi. Indeed, Defendants claim (and presented at trial) that Minehan stole or misappropriated money *from Christi*, diverted *Christi's* assets, and fraudulently misrepresented *Christi's* financial status in order to abuse *Christi's* line of credit. ECF No. 64 at 41–46. These are separate and apart from the claims asserted by Defendants in their individual capacities that Minehan breached the fiduciary duties owed to Defendants as

shareholders, made fraudulent misrepresentations to Defendants, and deprived them of assets to which they were entitled as Christi shareholders. *Id.* at 42–48. Accordingly, Defendants' counterclaims—both direct and derivative—are properly asserted.

### B.  Plaintiff's Claims

The Court finds Defendants liable on Count VII and not liable on all other Counts. The Court will award Minehan $246,018.22 in damages and limited, related attorneys' fees and costs.

#### i.  Breach of Fiduciary Duty and Minority Shareholder Oppression (Counts I, III, and IV)

To establish a breach of fiduciary duty, Minehan must prove: (1) the existence of a fiduciary relationship between himself and Defendants; (2) Defendants negligently or intentionally failed to act in good faith and solely for Minehan's benefit in all matters for which he was employed; (3) Minehan suffered an injury; and (4) Defendants' failure to act solely for Minehan's benefit was a real factor in bringing about his injuries. *See Snyder v. Crusader Servicing Corp.*, 231 A.3d 20, 31–32 (Pa. Super. 2020); *see also Meyers v. Sudfeld*, No. 05-CV-2970, 2007 WL 419182, at *10 (E.D. Pa. Feb. 2, 2007).

As majority shareholders, Defendants owe Minehan a fiduciary duty. *See Retina Assocs. of Greater Phila., Ltd. v. Retinovitreous Assocs.*, 176 A.3d 263, 277 (Pa. Super. 2017). Freezing out a minority shareholder "for the benefit of the majority shareholders constitutes a breach of the majority shareholders' fiduciary duty to the minority shareholders." *Ford v. Ford*, 878 A.2d 894, 905 (Pa. Super. 2005). Examples of a freeze out include withholding information about business operations, excluding the minority shareholder from meaningful participation in the decision-making process, and withholding the minority shareholder's proper share of benefits. In a closely

held corporation, such as Christi, the majority shareholders' duties are particularly strong. *Grill v. Aversa*, 908 F. Supp. 2d 573, 592 (M.D. Pa. 2012).  However, the law does not prohibit majority shareholders from ever acting in their own interest; rather, "when they do act in their own interest, it must also be in the best interest of all shareholders and the corporation." *Viener v. Jacobs*, 834 A.2d 546, 556 (Pa. Super. 2003) (quotation omitted). Moreover, whether an action is oppressive is based on the "reasonable expectations" held by minority shareholders. *Ford*, 878 A.2d at 890.

Viewing the aggrieved of conduct holistically, rather than piecemeal, the Court finds that Minehan has not been oppressed as a minority shareholder and Defendants have not breached their fiduciary duties. Though Minehan's role in the day-to-day decision-making process and Christi operations has been somewhat constrained since being removed as President, when framed against Minehan's misconduct and misappropriation of Christi funds it was unreasonable of him to expect anything else. Even so, Defendants have continued to provide Minehan with regular bank statements and financial information, alert him to agenda items, and provide notice of new policies being contemplated prior to their enactment. Crucially, he has received reimbursements and payouts like other shareholders. Moreover, the new policies enacted and financial controls put in place are entirely reasonable based upon the nature and extent of Minehan's fraud. Though Minehan's wages have been withheld, discussed *infra*, because Defendants acted in good faith and in the best interest of Christi, the Court does not find that this independently qualifies as a breach of fiduciary duty. Simply, Defendants have acted to repair the damage done by Minehan's presidency and Christi's finances and company culture have flourished under their new leadership. To the extent that Minehan's position has changed as a result, this is the incidental consequence of repairing the damage he caused. Any other expectations he harbors are wholly unreasonable.

Accordingly, Defendants are not liable to Minehan for breach of fiduciary duty or minority shareholder oppression.[13]

### ii.  Violation of Pennsylvania's Wage Payment and Collection Law (Count VII)

Pennsylvania's Wage Payment and Collection Law ("WPCL") provides employees with a cause of action to enforce payment of compensation improperly held by employers. *Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 574 (Pa. Super. 2006) (citation omitted). The WPCL does not create a right to compensation but, rather, provides a remedy when an employer breaches a contractual obligation to pay earned wages. *Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990) (citations omitted). To prevail on a WPCL claim, a plaintiff must establish: (1) the entity that withheld wages from the plaintiff is an "employer" under the WPCL;[14] (2) the plaintiff is contractually owed the withheld wages; and (3) the employer, in fact, withheld the contractually owed wages. *See Hirsch v. EPL Techs., Inc.*, 910 A.2d 84, 88 (Pa. Super. 2006).

The statute defines "wages" as "all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation." 43 P.S. § 260.2a. This also encompasses "fringe benefits or wage supplements whether payable by the employer

---

[13]    Minehan has asked the Court to force a buyout of his shares because of the alleged minority shareholder oppression and breach of fiduciary duty. Because the Court does not find that such oppression has occurred and no duties were breached, there is no basis to force a sale by judicial fiat. *Cf. Linde v. Linde*, 220 A.3d 1119, 1147–48 (Pa. Super. 2019) (such equitable relief is available to redress the breach of a fiduciary duty).

[14]    The statute defines "employer" as "every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." 43 P.S. § 260.2a. The parties do not dispute this element because Christi is clearly an employer.

from his funds or from amounts withheld from the employe[e]'s pay by the employer." *Id.* The bi-weekly draws and commission earned qualify as wages.

Minehan had an implied contract to the withheld wages, which is sufficient for the purpose of the WPCL. *See Burrell v. Staff*, 60 F.4th 25, 49 (3d Cir. 2023); *see also Martin v. Little, Brown & Co.*, 450 A.2d 984, 987 (Pa. Super. 1981) ("An implied contract is an agreement which legitimately can be inferred from the intention of the parties as evidenced by the circumstances and 'the ordinary course of dealing. . .'"). Historically, Christi always paid producers bi-weekly wages even when the employee's 224 account was negative. This ordinary course of business created an implied contract for such wages.

Defendants were not entitled to withhold Minehan's wages as a loan repayment, nor were they entitled to withhold his wages pursuant to the 2021 Governance Policy. First, Pennsylvania law allows for deductions from employee wages for the repayment of bona fide loans "provided the employe[e] authorizes such deductions *in writing* either at the time the loan is given him or subsequent to such loan." 34 P.S. § 9.1(10). Though Minehan made broad promises to fix his 224 account, Defendants have not demonstrated that Minehan ever agreed to do so via withheld wages and, moreover, that this was memorialized in writing as required by the statute. Additionally, Defendants rely upon the 2021 Governance Policy to establish that Minehan is not contractually entitled to the withheld wages because, per the Policy, no producer is permitted to carry an overdrawn 224 account in excess of $25,000. However, employers cannot enact a policy designed to evade the WPCL. *See* 43 P.S. § 260.7 ("No provision of this act shall in any way be contravened or set aside by a private agreement."). Thus, this provision of the Policy is unenforceable. *See Viancourt v. Paragon Wholesale Foods Corp.*, No. 20-CV-628, 2023 WL 2726705, at *23 (W.D. Pa. Mar. 31, 2023).

It is undisputed that Minehan was not paid on a bi-weekly basis as a means to pay back the negative balance on his 224 account. Nor is it disputed that he could not contribute to his 401(k) because he was not receiving W-2 wages and, accordingly, Christi did not contribute to his 401(k). Accordingly, Defendants have violated the WPCL. Minehan is entitled to damages in the amount of $226,385.67 (representing his earned wages), $10,250 (representing the 401(k) contribution), $9,382.55 (representing the unaccounted-for chargebacks),[15] and reasonable attorneys' fees **as to this claim only**.[16] *See* 43 P.S. § 260.9a(f) (The Court "shall, in addition to any judgment awarded to the plaintiff . . ., allow costs for reasonable attorneys' fees."). However, because Defendants withheld Minehan's wages in good faith,[17] the Court will not award liquidated damages. Finally, because the negative balance of Minehan's 224 account was cured only by way of the withheld wages, Defendants may modify Minehan's 224 account to add back in the now-unpaid $226,385.67 owed to Christi.

Notably, the Court sees no legal basis, based on the pleadings and claims here, to allow the Court to add this amount to the damages award to Christi. However, the Court having found that this same $226,385.67 is now due and owing by Minehan to Christi, if Christi were to move in a

---

[15]    The unexplained chargebacks had the effect of Minehan paying more than he likely should have to reimburse his 224 account via withheld wages.

[16]    Plaintiff's counsel must submit proof of attorneys' fees relative to the WPCL claim. Attorneys' fees and costs as to this issue must be specifically identified and attested to. If the fees and costs cannot be identified independently of the entire litigation, the Court will not award such fees and costs. To reiterate, the Court will only award attorneys' fees and costs that directly and specifically relate to the WPCL claim which formed a minute part of this case.

[17]    The Court notes that Defendants' decision to withhold wages, when faced with Minehan's unauthorized quarter-of-a-million-dollar unauthorized loan and Minehan's denial, defiance, obfuscation, and hostility, made sense as a business decision and was an equitable solution under all the circumstances including: (i) Minehan's misconduct; (ii) the money he owed (and still owes); (iii) the genuine business concerns as to whether and how Minehan will repay Christi; and (iv) that Minehan had more than sufficient resources to provide for himself without such wages. Moreover, the payment and tax structure employed were reviewed and approved of by Christi's accountants. Finally, once Minehan's debts had been repaid, his bi-weekly payments resumed. On balance, the Court finds that Defendants acted in good faith, violation of WPCL notwithstanding.

contract action to recover $226,385.67, Minehan would clearly be subject to collateral estoppel principles and could not take the position that he does not owe this amount to Christi. Without question, once Minehan's withheld wages are paid back, he will owe $226,385.67 to Christi.

### iii.   Civil Conspiracy (Count VI)

To prevail on his civil conspiracy claim, Minehan must prove the following: (1) a combination of two or more persons acting with a common purpose to do an unlawful act; (2) malice; (3) an overt act done in pursuance of the common purpose; and (4) actual legal damage. *LVL Co., LLC v. Atiyeh*, 469 F. Supp. 3d 390, 422 (E.D. Pa. 2020). Importantly, "absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." *Pelagatti v. Cohen*, 536 A.2d 1337, 1342 (Pa. Super. 1987). As discussed, *supra*, Minehan's only viable cause of action arises under the WPCL.[18] However, Minehan cannot show that Defendants acted with malice in withholding his wages and, accordingly, they cannot be liable for civil conspiracy. *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 212 (Pa. Super. 2003) (proof of malice, defined as an intent to injure, is required). Indeed, malice requires that the "sole purpose of the conspiracy was to injure the plaintiff," that this intent was without justification, and, accordingly, "a showing that a person acted for professional reasons, and not solely to injure the plaintiff, negates a finding of malice." *DePuy Synthes Sales, Inc. v. Globus Medical, Inc.*, 259 F. Supp. 3d 225, 248 (E.D. Pa. 2017) (citations omitted). As discussed, the decision to withhold Minehan's wages was premised on the need to recoup the money he stole from Christi. Though

---

[18] The Court notes that Plaintiff believes that Defendants conspired to relocate Christi offices to avoid paying deferred maintenance on the Bickley Building. Based on the terms of the lease and the maintenance expenses paid over the years, the Court does not find that Defendants owe Minehan any deferred maintenance. Moreover, the Court does not find that Defendants moved to avoid such payment; rather, they moved as a result of Minehan's misdeeds including, most relevantly, the extra rent payments he obtained via the Bickley Building.

the shareholders' relationships have been strained, the evidence does not show that Defendants were motivated by an intent to injure Minehan rather than desire to rehabilitate Christi. Without a finding of malice, Minehan's civil conspiracy claim must fail.

### iv.  Appointment of a Receiver (Count V)

Under Pennsylvania law, the Court is empowered to appoint a custodian to take control of a corporation if, *inter alia*, the directors are acting illegally or oppressively. 15 Pa. Cons. Stat. §§ 1767(a)(3), 1981(a). However, that power should be "used sparingly, with caution and circumspection, and only in an extreme case." *Hill v. Cohen*, 40 F.4th 101, 105 (3d Cir. 2022) (citing *Tate v. Phila. Transp. Co.*, 190 A.2d 316, 321 (Pa. 1963)). Tension among the shareholders notwithstanding, this is not such an extreme case to warrant appointing a receiver.[19]

### C.  Defendants' Counterclaims

The Court finds that Defendants' counterclaims are not barred by the statute of limitations and that Minehan is liable on Counts I–III, V, and VII–VIII and not liable on Counts IV and VI. The Court will award Christi $2,118,430 in damages, $723,674 in pre-judgment interest, and $100,000 in punitive damages. The Court will also award Lunney and McDowell attorney and expert fees and costs because this was a successful derivative action.

### i.  Statute of Limitations

Minehan has tried several times to argue that Defendants' counterclaims are barred by the statute of limitations. This is to no avail. First, the statute of limitations begins to run only once the injured party knows, or in the exercise of reasonable diligence should have known, of the injury

---

[19]  The Court addresses this count for the sake of completeness but notes that this relief is sought derivatively on behalf of Christi, which the Court deemed improper.

and its cause. *Knopick v. Connelly*, 639 F.3d 600, 607 (3d Cir. 2011) (citations omitted). Defendants sought information about Christi finances and Minehan's spending but were met with hostility and given incomplete (at best) financial records. It does not follow that Defendants should have been aware of Minehan's misdeeds when he actively sought to conceal them and, in fact, did so by miscoding expenses, maintaining a separate set of books, exerting pressure over Christi bookkeepers, and either providing Defendants false assurances or admonishing them for asking questions. Defendants acted reasonably in investigating any issues but, largely due to the extent of Minehan's fraud, they were unaware of Christi's true financial condition until Jardel blew the whistle in 2021. Accordingly, the statute of limitations was tolled up to that point.[20]

### ii.   Doctrine of Laches

Minehan also argues that Defendants' counterclaims are barred by the doctrine of laches. Under this doctrine, Minehan must establish: (1) an inexcusable delay in bringing the action and (2) prejudice. *United States Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 208 (3d Cir. 1999). Courts analyze whether any delay was inexcusable in light of the equities of the case. *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946, 949 (3d Cir. 1971).

Minehan primarily asserts that he has been prejudiced because the documents he needs to corroborate his testimony have since been misplaced. Even so, as discussed several times over, Minehan concealed his extensive fraud, allayed Defendants concerns or lambasted them when they made inquiries, and manipulated the records provided to Defendants (while gatekeeping the true

---

[20]      Moreover, Minehan is equitably estopped from invoking the statute of limitations due to his rampant fraudulent concealment. *Fine v. Checcio*, 870 A.2d 850, 860–61 (Pa. 2005) ("[T]he defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts[,]" however, "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause.").

financial records). Naturally, as a result of his fraud, Defendants were not aware of Minehan's conduct for many years. Once the light shone on Minehan's fraudulent activities, in 2021, Defendants quickly engaged counsel and, through this litigation filed shortly thereafter, brought their counterclaims. Considering the equities of this case, any delay on Defendants' part was excusable. Therefore, the doctrine of laches does not bar Defendants' claims.

### i.  Fraud (Counts VII and VIII)

Under Pennsylvania law, the elements of fraud are: (1) (a) a misrepresentation or (b) a concealment; (2) which is material to the transaction at hand; (3) (a) made with knowledge of its falsity or recklessness as to whether it is true or false (for a misrepresentation), or (b) calculated to deceive (for a concealment); (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury proximately caused by such reliance. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 205 (3d Cir. 2022) (citation omitted). To prevail, Defendants must prove each element by clear and convincing evidence. *Weissberger v. Myers*, 90 A.3d 730, 735 (Pa. Super. 2014).

Minehan stole over two million dollars [21] from Christi (and, by extension, other shareholders) over the course of a decade. He did this by both materially misrepresenting Christi's finances and his personal use thereof *and* concealing the same. For example, Minehan intentionally miscoded or misrepresented personal expenses so that the general ledger did not accurately reflect Christi's finances or the money he had taken, took unrecorded "loans" from Christi's credit line, maintained a separate set of books, falsely represented that he was paying for personal transactions

---

[21]   The evidence points to the suggestion that he misappropriated more funds that cannot be sufficiently quantified given Minehan's "bookkeeping" methods.

when, in reality, they were paid by the Christi credit line.[22] Indeed, when confronted by other shareholders, Minehan steadfastly maintained that Christi required a credit line because of Faraco's fraud. While this may have been true initially, the credit line also became a conduit for Minehan's fraud.

Minehan engaged in the above-referenced conduct, among other things, with knowledge of the falsity of such statements and intent to mislead Defendants so that he could remain in power, maintain exclusive control over Christi finances, and continue to defraud Christi (and other shareholders), all while his production decreased dramatically. On the rare occasion that Minehan told Defendants about a personal purchase (*e.g.*, the gold coin), he fraudulently promised that Christi would not be paying for such purchases. Moreover, when other shareholders questioned Minehan regarding the credit line, Minehan's 224 account, or similar, Minehan deflected. Specifically, Minehan deemed everyone else ignorant about company operations and finances and, most importantly, pacified them by pointing to incomplete, inaccurate, and falsified financial records. Minehan maintains that Defendants' claims for fraud must fail because Defendants' reliance on Minehan's representations, despite a few instances of skepticism over the years, was unjustified. However, the linchpin of Minehan's fraud (and Defendants' reasonable reliance) were the financial records he manipulated. Indeed, Defendants justifiably relied on both Minehan's

---

[22]    Minehan argues that Defendants failed to prove that several statements were false when made and, therefore, these statements cannot qualify as misrepresentations (*i.e.*, Minehan told shareholders that he had to "play cash flow games" and they "[didn't] know the half of it," Minehan stated that accountants did not know about the unrecorded books, Christi still required the credit line, Christi would not pay for his personal purchases). Moreover, Minehan argues that several statements related to future plans or intentions and, therefore, cannot be false unless Minehan knowingly misstated his true state of mind. First, the Court reiterates that the Court found Minehan largely not credible and Defendants largely credible. Second, even if Minehan did eventually repay Christi, the Court does not find that this is indicative of his state of mind at the time. Third, several of these statements demonstrate not only misrepresentations but, additionally, concealment (*e.g.*, failure to disclose the unrecorded loans to the accountants). *See Wilson v. Donegal Mut. Ins. Co.*, 598 A.2d 1310, 1315 (Pa. Super. 1991) (Concealment is failure to disclose that which should have been disclosed).

statements (and his stature as President) and the documents he manipulated to corroborate his narrative. Finally, as a proximate result of Minehan's misstatements and concealments, Christi suffered immense financial loss and Defendants were required to make significant payments via the 2021 capital call, as described *supra*. Accordingly, Minehan is liable for fraud on Counts VII and VIII.

### ii.   Breach of Fiduciary Duty (Counts I and II)

To establish a breach of fiduciary duty, Defendants must prove: (1) the existence of a fiduciary relationship between themselves and Minehan; (2) Minehan negligently or intentionally failed to act in good faith and solely for their benefit in all matters for which they were employed; (3) Defendants suffered an injury; and (4) Minehan's failure to act solely for their benefit was a real factor in bringing about their injuries. *See Snyder*, 231 A.3d at 31–32; *see also Meyers*, 2007 WL 419182, at *10.

As President and the controlling shareholder Minehan owed fiduciary duties to Christi and other shareholders. *See* 15 Pa.C.S. § 512(c); *see also The Winer Family Trust v. Queen*, No. 03-CV-4318, 2004 WL 2203709, at *24 (E.D. Pa. Sept. 27, 2004), *aff'd sub nom*, *Winer Family Tr. v. Queen*, 503 F.3d 319 (3d Cir. 2007). By using Christi's assets to fund his own personal expenses and concealing his misconduct by miscoding expenses or leaving expenses off the general ledger and misusing Christi's credit line (among other things), Minehan intentionally failed to act in good faith and failed to act solely for the benefit of Christi and other shareholders. Additionally, Defendants were injured because, *inter alia*, Christi suffered financial loss, was placed in a precarious financial situation, and other shareholders were forced to front money via the capital call that would have otherwise been unnecessary if not for Minehan's fraud. Minehan's conduct

was not only a factor in causing such injuries but the only factor. Accordingly, Minehan is liable for breach of fiduciary duty on Counts I and II.

### iii.   Conversion (Counts III and IV)

Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel or other interference therewith, without the owner's consent and without lawful justification." *Houser v. Feldman*, 600 F. Supp. 3d 550, 567 (E.D. Pa. 2022). Money is the subject of conversion when the injured party had a property interest in the money at the time of the alleged conversion. *Montgomery v. Fed. Ins. Co.*, 836 F. Supp. 292, 300 (E.D. Pa. 1993). However, failure to pay a debt is not conversion. *See id.* (no claim for conversion where defendant "was merely accepting money that was owed to [him] by virtue of the parties' agreement").

As President, Minehan controlled Christi's assets. Indeed, Minehan improperly exercised control over such assets by, *inter alia*, purchasing real estate and gold coins, paying himself extra rent payments, charging for maintenance on his personal property, charging an extra personal car to Christi, obtaining credit card reimbursements for non-business expenses, and obtaining excess life insurance.[23] Such conduct interfered with Christi's immediate right to use and property interest in its corporate assets. Additionally, Minehan's conduct was done without consent or justification.[24] Finally, Minehan's actions were to his own financial benefit, and to the detriment

---

[23]     Though Minehan became indebted to Christi for some of these transactions (and, indeed, classifies many as "loans"), particularly to the extent that they resulted in a negative balance to his 224 account, they were not true debts for these purposes because they were not voluntarily and knowingly paid pursuant to agreed upon terms and conditions. *Cf. Corporate Plaza Partners, Ltd. v. Am. Emp'r Ins. Co.*, No. 95-CV-5234, 1996 WL 180696, at *1 (E.D. Pa. Apr. 3, 1996) (dismissing a counterclaim for conversion where defendant *voluntarily* paid money to the opposing party pursuant to terms of the parties' agreement).

[24]     Minehan has asserted that he was entitled to take additional draws and use Christi's assets for personal use because his property collateralized Christi's credit line. However, whether the credit line was still required, or merely a façade for Minehan's misconduct, is unclear at best. Therefore, this purported justification does not hold water. Moreover, even if the Court were to accept Minehan's narrative, such an arrangement (without other shareholders' consent) is inappropriate from an accounting perspective, which

of Christi, and were the proximate cause of damages suffered (*i.e.*, the misappropriation of over $2 million). Minehan is liable for conversion on Count III.

However, although Lunney and McDowell had some tangential property interest in Christi's assets as shareholders, they have not shown that they had any immediate property interest in Christi's assets at the time of Minehan's misconduct. *Ueberroth v. Goldner, Papandon, Childs & DeLuccia, LLC*, No. 11-CV-3119, 2012 WL 834737, at *3 (E.D. Pa. Mar. 12, 2012) ("A cause of action in conversion is properly asserted if the plaintiff had actual or constructive possession of a chattel or an immediate right to possession of a chattel at the time of the alleged conversion."). Accordingly, Minehan is not liable to Defendants in their individual capacities on Count V.

### iv.   Unjust Enrichment (Counts V and VI)

To prove unjust enrichment, Defendants must show: (1) Defendants conferred a benefit on Minehan; (2) Minehan appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit. *Liberty Fencing Club LLC v. Fernandez-Prada*, No. 17-CV-0180, 2017 WL 3008758, at *11 (E.D. Pa. July 14, 2017) (citation omitted). As discussed throughout, Minehan misappropriated Christi's money.  Even if the money Minehan siphoned from Christi were a loan, which it was not, Christi has not been paid back in full. Thus,

---

further undermines Minehan's justification. ECF No. 169 at 101:9-16. Despite Minehan's contention to the contrary, Defendants cannot be said to have consented to the arrangement when the representations they received from Minehan and the financial records furnished did not adequately inform Defendants of Minehan's financial transactions such that they could give affirmative (or even implied) consent. Finally, the Court notes that little to no corroborating evidence was introduced to bolster Minehan's justification regarding the collateralized property and, indeed, his justification is belied by the secrecy that accompanied his financial dealings.

Minehan has been unjustly enriched and it would be inequitable for Minehan to retain Christi's assets.[25] Accordingly, Minehan is liable for unjust enrichment on Count V.

However, much like their individual conversion claim, Defendants have not shown that they conferred a benefit on Minehan in their individual capacities. *Salviti v. Lascelles*, No. 19-CV-00696, 2023 WL 3010772, at *6–7 (E.D. Pa. Apr. 19, 2023) ("[a]n unjust enrichment plaintiff must describe the benefit conferred with some specificity."). Accordingly, Minehan is not liable for unjust enrichment on Count VI.

### v. Damages

The Court will award Christi, whom Defendants represent in the derivative action, $2,118,430 in compensatory damages, $723,674 in pre-judgment interest, and $100,000 in punitive damages. The Court will also award Defendants attorneys' fees and expert costs, to be paid by Christi because they brought a successful derivative action.

### 1. Compensatory Damages and Pre-judgment Interest

The law "does not command mathematical preciseness from the evidence in finding damages, [but] sufficient facts must be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture." *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 895 (3d Cir. 1975). Additionally, while an award of damages "cannot be based upon mere guess or speculation[,] . . . where a defendant's wrongful conduct renders an exact calculation of damages

---

[25]     Minehan argues that he was not unjustly enriched under the circumstances because Christi did not have any formal policies governing reimbursements, shareholders' insurance policies, or other benefits. This argument does not advance Minehan's position. If such polies existed, Defendants may have brought a breach of contract claim. However, unjust enrichment is an equitable doctrine that applies when the benefit conferred is not founded on a written agreement or express contract. The circumstances here, which show significant fraud and misappropriation of funds by Minehan, would make it inequitable for Minehan to retain the proceeds of his fraud.

difficult," the defendant shall not profit from its misconduct due to plaintiff's failure to provide precise evidence of damages. *Centrix HR, LLC v. On-Site Staff Management, Inc.*, 349 Fed. App'x 769, 775 (3d Cir. 2009) (citations omitted). Defendants' expert, Duffy, after conducting a forensic accounting review, found that Minehan owed Christi $2,118,430 as of July 10, 2023. ECF No. 173, Ex. 1. Minehan counters that *at most* the evidence supports a finding that Minehan owes $362,539 because Defendants did not identify every single transaction at issue with exacting precision during the trial. ECF No. 176, Ex. A.

At the outset, the Court notes that any difficulty in determining the true amount owed is, ultimately, on Minehan. He was the one who miscoded, misappropriated, and mishandled Christi finances. Moreover, it is Minehan who purports to have paid back all loans but, in the same breath, struggles to identify evidence to support the repayments. Who better to follow the money than the one who authorized the "loan," benefited from it, and, purportedly, repaid it? Additionally, as the Court has repeatedly provided, Duffy was a credible expert whose findings were supported by reliable sources and methods. Indeed, it was Duffy who was able to identify instances where Minehan claimed to have "repaid" a loan but, in reality, these repayments were bounced checks, duplicative, or immediately transferred out of Christi for Minehan's personal use. Though Duffy did not go through every single transaction, reimbursement, overpayment, direct payment, or diverted fund identified on a line-by-line basis,[26] this does not mean that Duffy's conclusions are mere guesswork. Indeed, the Court is confident that Duffy's findings are, at the very least, intelligent estimates of the amount owed by Minehan based on Christi's financial records and

---

[26] This would have substantially and unnecessarily increased the length of trial and likely would have been a waste of judicial resources. However, when Duffy was cross examined on specific "repayments" that were not included in his analysis, he had a response for each. Moreover, Minehan did not provide any conflicting evidence or documentation to undermine the damages calculation.

corroborating evidence. Accordingly, the Court adopts Duffy's calculations in full and will award Christi $2,118,430 in damages.[27]

"[P]re-judgment interest may be awarded 'when a defendant holds money or property which belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of his unjust enrichment.'" *Kaiser v. Old Repub. Ins. Co.*, 741 A.2d 748, 755 (Pa. Super. 1999) (quoting *Dasher v. Dasher*, 542 A.2d 164, 164–65 (Pa. Super. 1988)). "Pennsylvania courts have awarded prejudgment interest . . . as an equitable remedy awarded to an injured party at the discretion of the trial court." *George M. Axilbund Trust v. Forman*, No. 214-EDA-2021, 2021 WL 5370828, at *6 (Pa. Super. Sept. 18, 2021) (citations omitted). Because the Court finds Duffy credible and his methodology reliable, the Court will adopt his pre-judgment calculation in full and award $723,674 in pre-judgment interest.[28]

## 2.  Punitive Damages

Punitive damages are proper in cases "where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchinson ex rel. Hutchinson v. Luddy*, 870 A.2d 766, 770–71 (Pa. 2005). Punitive damages are intended to both punish a tortfeasor for his conduct and to deter him and others from similar conduct. *See id.* Importantly, the tortfeasor must have acted intentionally, recklessly, or maliciously. *Id.* Additionally, though due process demands

---

[27]     The Court notes that Defendants do not seek damages in their individual capacities other than the amount requested, and which will be awarded, for Christi's benefit. Though the Court does not need a precise delineation of damages, Defendants have not demonstrated what amount, if any, of compensatory damages are required to make Lunney and McDowell whole with respect to Counts II and VIII. Accordingly, the Court declines to speculate and will award damages only to Christi.

[28]     The Court notes that this calculation is for interest accrued through July 10, 2023 (the date that post-trial findings of fact and conclusions of law were due). The Court will not calculate or award additional interest for the passage of time between July 10 and present because the parties had no control over when the Court issued its final verdict.

that punitive damage awards "must not be disproportionately excessive to the degree of reprehensibility," in a bench trial, the Court is afforded significant deference in awarding punitive damages. *See Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 231 (3d Cir. 2005). Here, Defendants seek $2,800,000 in punitive damages—an amount they claim is approximately ten percent of Minehan's net worth. Minehan argues that the net worth calculations are significantly over-inflated and, moreover, his conduct was not outrageous.

The Court finds that Minehan's conduct was, indeed, outrageous. Most specifically, Minehan's acted maliciously when he: (i) forced a capital call that was only necessary because of his mishandling of Christi finances; (ii) diverted money from Christi employees' 401(k)'s for his personal use (and flippantly commented "Fuc them" [sic] when Rongione responded that employees would be checking their 401(k) balances); (iii) paid himself a thirteenth month of rent several times over; and (iv) used Christi's assets to purchase a yacht, cattle farm, and gold coin while, at the same time, affirmatively telling his partners that Christi *would not* be paying for these expenses. At the very least, Minehan was reckless by rampantly miscoding expenses, using Christi's line for personal expenses, maintaining a handwritten set of books, thwarting shareholders' attempts to gain insight into Christi's finances, allowing his 224 account to accrue such a substantial negative balance. Punitive damages are therefore appropriate. However, the Court finds the $2.8 million proposed by Defendants to be excessive.[29] Accordingly, the Court will award $100,000 in punitive damages.

---

[29]     At trial, Minehan estimated that his net worth is between $10-15 million. ECF No. 169 at 130:10-12. However, an award of even ten percent of this reduced net worth would be excessive.

### 3. Attorneys' and Expert Fees and Costs

Defendants also seek attorneys' fees and costs and those of their expert because they have prevailed on their derivative claims and because Minehan has acted in bad faith in bringing and sustaining this litigation. Though Minehan's conduct giving rise to this litigation is worthy of condemnation, and despite his imperfect actions throughout this litigation, it cannot be said that he acted in bad faith by bringing and sustaining litigation in which one of his claims prevailed. However, the Court will award attorneys' fees and costs, including expert costs, to Defendants because the party bringing an action "in a shareholders' derivative action may . . . recover their expenses, including attorneys' fees, from the corporation on whose behalf their action is taken if the corporation derives a benefit, which may be monetary or nonmonetary, from their successful prosecution . . . of the case." *Shlensky v. Dorsey*, 574 F.2d 131, 149 (3d Cir. 1978). Christi has derived a substantial benefit in the form of a $2.1 million damages award (and pre-judgment interest). Accordingly, Defendants are entitled to attorneys' fees and costs, as well as those of Duffy based on their derivative claims.[30]

### IV.  CONCLUSION

For the reasons stated above, this Court finds Defendants liable as to Count VII and will award damages in the amount of $246,018.22, plus attorneys' fees and costs. The Court further finds Minehan liable as to Counts I–III, V, and VII–VIII of Defendants' counterclaims and will award Christi $2,118,430 in damages, $723,674 in pre-judgment interest, and $100,000 in punitive damages.

---

[30]     Defendants must submit attorneys' fees and costs, and those of Duffy, to the Court for review. Counsel should not include fees which were already awarded by this Court.

BY THE COURT:


/s/ Chad F. Kenney

_____

CHAD F. KENNEY, JUDGE